IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DOREN T. WATKINS,                     )
                                      )
         Plaintiff,                   )
                                      )
v.                                    )      Case No. 2:04-cv-1152-MEF
                                      )      (WO - Recommended for Publication)
MONTGOMERY COUNTY BOARD               )
OF HEALTH, *et. al.*,                 )
                                      )
         Defendants.                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Doren T. Watkins brings suit against her employer, the Montgomery County Board of Health, Area Administrator Bobby H. Bryan, Assistant Area Administrator James R. Martin, The Alabama Department of Public Health, and State Heath Officer Donald E. Williamson, alleging race discrimination, a hostile work environment, and retaliation. Specifically, Watkins alleges violations of Title VII, 42. U.S.C. § 2000(e) *et. seq.* (hereinafter "Title VII"), 42 U.S.C. § 1981, the Fourteenth Amendment's Equal Protection Clause (through 42 U.S.C. § 1983), and the First Amendment (through 42 U.S.C. § 1983). This cause is presently before the Court on Defendants' Motion for Summary Judgment (Doc. # 38).

### I. Jurisdiction and Venue

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1343 (civil rights) and 42 U.S.C. § 2000(e) to 2000(e)-17 (Title VII). The parties do not contest personal jurisdiction or venue, and the

Court finds adequate allegations of each.

## II.  Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the

other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale,* 333F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the non-movant).  After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) (internal marks and citations omitted)).

## IV. Facts

Watkins is an African-American female who at all relevant times has been an employee of the Alabama Department of Public Health (hereinafter "ADPH").  She was hired in 1993 as a Nurse II[1] and was assigned to the Montgomery Specialty Clinic, also

---

[1] Nurse II was the state merit system classification for her position.

known as the Montgomery STD Clinic (hereinafter "STD Clinic").  She was promoted to
Nurse III in 1993.  She was transferred to a different clinic in 1995, but returned to the STD
Clinic as the clinic coordinator in 2001.  Since her return to the STD Clinic, Pat Schloeder
has been her immediate supervisor.  In 1999, Watkins was promoted to Nurse IV.  In 2002,
the state merit system classification system pertaining to nurses changed and Watkins' Nurse
IV classification was converted to Nurse Coordinator.  Watkins is still classified as a Nurse
Coordinator and her position title is STD Clinic Coordinator.

The STD Clinic is a walk-in clinic located within the Montgomery County Health
Department facility.  Its mission is to diagnose and treat sexually-transmitted diseases and
to prevent the spread of these diseases in the community.  The clinic is staffed by two
clerical workers and three nurses, one of which is Watkins.  The nurses are responsible for
procedures (such as laboratory testing and venipuncture), physical examinations, and
counseling.  As the Clinic Coordinator, Watkins is also responsible for supervising the other
nurses and the clerical workers.

A.    *October 2003 Incident*

On October 9, 2003, a client phoned the STD Clinic and was told that she needed to
be at the clinic before 3:30 p.m. the next day.  On October 10, 2003 at approximately 3:40
p.m., the same client sought services from the clinic and was turned away.  The client
informed James Martin, the Assistant Area Administrator, of the incident and he took her
back to the clinic and she was examined.  Watkins claims that the client was turned away

4

because she believed that the intake closure time was 3:30 p.m.  Watkins asserts that 3:30 p.m. was the closure time when she began working at the clinic in 1993 and that the manager in 2000 circulated a memo stating that the intake time was from 7:30 a.m. to 3:30 p.m.

On October 15, 2003, Martin and Schloeder met with Watkins to discuss the incident. According to Schloeder, she and Martin determined from the meeting that the client was turned away so that the STD Clinic nurses could watch a training video.  On October 17, 2003, Schloeder drafted a written warning to Watkins.  The warning stated that a client was turned away from the clinic at 3:40 p.m. when all three nurses were in the clinic and no clients were waiting.  It further stated that two of Watkins' responsibilities were "1) to direct, monitor and evaluate clinic activity so that patient care is provided in an efficient and high quality manner and 2) to direct, monitor and evaluate clinic personnel so that job duties are performed in a safe/effective manner."  It stated that client care should always take priority over training.  Watkins acknowledged receipt of this warning on October 22, 2003 and it was maintained in her employee file.

On October 21, 2003, Watkins wrote a memo to Schloeder asking what the appropriate intake stopping time was.  In response, in a memo dated October 21, 2003 to all STD Clinic staff, Schloeder stated that, effective that date, the clinic hours would be from 7:30 a.m. to 5:00 p.m. and that clients would be permitted to sign in until 4:00 p.m.  The memo further stated that if a client comes in after 4:00 p.m., the clinic coordinator or nurse in charge should be notified and that she should evaluate the clinic staffing and the number

5

of clients already signed in.  If she believes a client cannot be seen after 4:00 p.m., she must document the reasons for asking the client to leave and return the following morning. Watkins acknowledged receiving this memo on October 22, 2003.  On October 22, 2003, Schloeder issued another memo to Watkins responding to her concerns and further clarifying the intake policy.

On October 22, 2003, Watkins wrote a memo to Schloeder rebutting the October 17, 2003 written warning.  The memo stated that the protocol since 1994 had been to stop client intake at 3:30 p.m. and requested that the written warning be removed from Watkins' personnel file.  On October 28, 2003, Martin, Schloeder, Watkins, and Barbara Lewis, the Area 8 Nursing Supervisor, met at Watkins' request to discuss her concerns about the written warning she received.  Lewis asked Watkins why she communicated with Schloeder through memos and not face-to-face.  Watkins responded that she felt that Schloeder was unapproachable.  Lewis asked Watkins to be more communicative with Schloeder.

On October 31, 2003, Watkins filed a grievance against Schloeder.  The grievance stated that Watkins believed she had been following protocol when the client was turned away at 3:40 p.m. and that she had been following instructions from Schloeder when she decided to show the training video.  The grievance further stated that Watkins believed that Schloeder brings down morale and would use Watkins' performance appraisal or other tactics in retaliation.  The grievance asked for the written warning to be removed from Watkins' file.

In a memo dated November 5, 2003, Martin responded to Watkins' October 31, 2003 grievance. He stated that disciplinary actions are not considered under the grievance policy, and therefore her request to have the written warning removed from her file could not be considered. He also stated that Watkins should not arbitrarily decide to refuse service based on the time of day, but should evaluate available resources. Finally, he pointed out that the year before Watkins had refused to give a patient an HIV test during the middle of the day.

B.      *January 2004 Incident*

On January 8, 2004, an STD nurse failed to draw blood on the first attempt and the client refused a second attempt. However, the client wanted to continue with a physical exam, but the nurse told her she could not do so if she did not first have the blood test. The client complained to Schloeder, then left the clinic without being examined. Schloeder claims that she discussed the incident with Watkins that same day.[2] Schloeder stated that she believed under the circumstances that a physical exam should have been performed. Watkins disagreed and stated that blood work must be done before a physical exam could be done. Schloeder stated that she would get clarification on the matter.

Schloeder then consulted with Lewis and with Marcy Gilder, a Certified Registered Nurse Practitioner with more than 25 years of experience with STD examinations. Gilder also consulted with Maxie Fleming, the State STD Director. All three agreed that a physical exam should have been performed under the circumstances.

---

[2] Watkins thinks that she was off from work that day, but is not sure.

On January 9, 2004, Schloeder approached Watkins in the lab area of the STD Clinic to tell Watkins that she was making changes to Watkins' work hours and break times. She then took Watkins to Watkins' office to discuss the previous day's incident. Schloeder advised Watkins that she had confirmed that a physical exam should be provided when a client refuses a blood test and instructed Watkins to provide a physical exam in such situations in the future. Watkins maintained her position that doing so would violate the protocol and showed Schloeder the protocol manual. Watkins alleges that Schloeder became upset and argumentative and pointed her finger and hand in Watkins' face. Watkins further alleges that it appeared as though Schloeder was going to slap her. Watkins also alleges that Schloeder said loudly "I know that I intimidate you, I don't care what the protocol says, I am your supervisor and you will do whatever I tell you to do." Schloeder alleges that Watkins was speaking loudly and that she told Watkins to lower her tone of voice and stop interrupting or she may be disciplined for insubordination.

On January 12, 2004, Watkins filed a grievance with Martin. According to Bobby Bryan, the Area 8 Administrator, he discussed the grievance with Martin and Lewis and instructed them to conduct an investigation and submit a report and recommendations to him. On January 14, 2004, Martin issued a memo to Schloeder instructing her not to meet with Watkins until further notice and to refrain from STD Clinic walk-throughs unless accompanied by Bryan, Lewis, or Martin. According to Martin, over the next few days, he and Lewis interviewed ten employees who worked in or near the STD Clinic. Out of those

ten employees, only two overheard anything.  Thelma McDade, an STD staff nurse, stated that the door to Watkins' office was open and she heard a loud discussion coming from inside.  She stated that the two women "gave as good as they got from each other" and that it sounded like two people strongly expressing their points of view.  Norma Acoff, a Disease Intervention Specialist, said that she could not hear everything that was said, but that Schloeder was talking to Watkins in a loud voice.

On January 14, 2004, Martin and Lewis interviewed Watkins about the incident.  They asked her to role play what had happened between her and Schloeder.  According to Lewis, Watkins' demonstration of Schloeder pointing her finger in Watkins' face in no way looked like Schloeder was threatening to slap Watkins.  According to Martin, Watkins became agitated during the interview and her words became confused to the point that she was not understandable.   Martin stated that Watkins' demeanor ranged from controlled to almost out of control throughout the interview.

Schloeder was also interviewed by Martin and Lewis on January 14, 2004.  Schloeder said that one of the issues she discussed with Watkins during the meeting was giving a physical exam if a client refused a blood test.  Schloeder admitted that she was talking with a "firm voice" and may have pointed her finger at Watkins from a seated position.  Schloeder said that she told Watkins, "You challenge everything I say to you and act defiantly."  Schloeder also said that she told Watkins to lower her voice because she did not want to discipline her for insubordination.  Schloeder also stated that Watkins became very

upset with Schloeder's position on the protocol.

At some point during the investigation, the ADPH Personnel Director, Sandra Wood, notified Martin and Lewis that Watkins had been discussing her grievance and making disparaging remarks about Schloeder to others in the ADPH. Wood suggested that Watkins be instructed not to discuss the grievance with anyone not directly involved in the grievance process. Accordingly, Martin and Lewis issued a memo to Watkins on January 16, 2004, stating that

> It has come to our attention that you have made comments to State lab and Central Office personnel about your supervisor and other elements of your grievance.
> This is disruptive and has resulted in unnecessary work in responding to inquiries caused by your comments. Within this department, you are to immediately cease discussing and making comments related to your grievance to persons other than those in your supervisory chain.

The investigation of Watkins' grievance was completed on January 20, 2004. Martin then prepared a memo summarizing the investigation and provided it to Bryan on January 29, 2004. A Supervisor's Response to Employee Grievance Report was prepared and signed by Martin and Bryan on January 29, 2004. The report stated that the results of the investigation did not support any of the allegations contained in Watkins' grievance report. Specifically, they found no evidence that Schloeder appeared as if she was going to slap Watkins. They also found no evidence that other employees approached Watkins to ask her about what had taken place. Furthermore, they found no evidence that Schloeder needed diversity, anger management, or STD protocol training. They did find evidence of Watkins

refusing to accept instructions from her immediate supervisor and evidence of a client not receiving a requested service that the clinic was capable of providing.  The solution offered by the report was that Watkins stay within her supervisory chain to resolve any future problems.   Watkins and Schloeder were also offered training in Interpersonal Communications.  Watkins was given the opportunity to accept or not accept the response and remedy offered.  If she chose not to accept, she was given the option of either appealing to the Appointing Authority or requesting mediation.   On January 29, 2004, Watkins indicated that she did not accept the response and remedy and wished to appeal to the Appointing Authority.

The matter was appealed to the Appointing Authority, Donald Williamson, who referred it to Danita Rose, the Employee Relations Officer, to speak with appropriate parties, review the facts, and make a recommendation on the grievance.  On February 11, 2004, Rose spoke with Watkins about her grievance.  In a memo to Watkins dated  February 20, 2004, Rose made the following recommendations:

1)      Written clarification of protocol be obtained and provided to all staff.
2)      Ms. Pat Schloeder conduct staff meetings on a regular basis with all clinic supervisors.
3)      Schedule Interpersonal Communication training for both Ms. Pat Schloeder and Ms. Doren Watkins in order to improve communication skills.
4)      Provide training/refresher course for STD staff for venipuncture.
5)      Ms. Pat Schloeder be counsel for lack of professionalism in addressing concerns with staff (i.e., finger pointing and speaking in a loud tone of voice).
6)      Ms. Doren Watkins be counseled for acting unprofessionally by speaking in a loud tone of voice when communicating with her

supervisor.

On February 20, 2004, Rose met with Watkins to discuss these recommendations.  Watkins was given an opportunity to either accept the response and remedy or not accept it and request mediation.  Watkins chose not to accept it, but also did not request mediation.

On February 27, 2004 , Martin and Bryan met with Watkins and discussed the investigation and the conclusions they had reached.  In a memo to Watkins dated March 1, 2004, Bryan summarized the matters discussed at the February 27, 2004 meeting.  At the meeting, Watkins was informed that Schloeder would resume supervising Watkins and that Watkins would be expected to comply with any final decisions made by Schloeder.  Watkins was also informed that they were going to implement the Employee Relations Officer's recommendations in response to her grievance.  Watkins was counseled about being mindful of her voice tone and body language when communicating with her supervisor and other staff.  Finally, Watkins was told that Bryan and Martin had conducted counseling with Schloeder.  On March 5, 2004, Watkins acknowledged that she had received the March 1, 2004 memo.

In a memo dated March 18, 2004, Dr. Charles Woernle, Assistant State Health Officer, clarified the STD Clinic visit protocol.  The memo stated that

> Should a patient refuse any aspect of the protocol, the refusal should be documented and all other components of the protocol should be completed. For example, if a patient refuses to have blood drawn, either initially or after unsuccessful attempts to draw blood, patient counseling is still provided and the appropriate record documented.  A physical exam and other components of the protocol should be performed.

On March 24, 2004, Martin and Lewis held a meeting with the STD Clinic staff to inform them of this clarification.  Watkins acknowledged receipt of the clarification but continued to disagree with it.

C.    *Appraisal Scores*

During the October 23, 2003 meeting with Martin, Schloeder, and Lewis, Watkins brought forth concerns that Watkins' performance appraisals of other employees were too low.  The supervisors stated that the appraisals were too high, and that Watkins' own appraisal would be lowered if she continued to give such high appraisals.  According to Schloeder, she was concerned that an "exceeds standards" score was too high for a probationary new employee because it gave little or no room for a new employee to improve.

In January 2004, Schloeder and Lewis met with Watkins concerning the appraisal score she had given one of the employees she supervised.  Lewis stated that the score should be lowered and Schloeder agreed.  Watkins alleges that she was told to lower the score or her own score would be lowered.  Watkins also alleges that Lewis was close in her face and said, "You will do this.  Do you hear me?"

D.    *April 2004 Incident*

On April 23, 2004 at approximately 3:30 p.m. an STD client was turned away from the clinic.  The client complained to the front desk receptionist, who then contacted Schloeder.  The client told Schloeder that he was told by Watkins that they were too busy to see him and that he would have to come back another day.  According to Schloeder, the

13

client complained about the attitude of the individual who turned him away and expressed frustration because he had been turned away from the clinic on the previous day as well. Watkins claims that the client was turned away because the clinic was understaffed and there were already five clients waiting.

On April 23, 2004, Schloeder prepared a written reprimand to be issued to Watkins concerning this incident.   The reprimand stated that Watkins failed to perform her responsibilities in "directing, monitoring, and evaluating STD clinic activity and staff to insure that client care is provided in an efficient and high quality manner consistent with efforts to provide appropriate and timely disease control services." Watkins acknowledged receipt of the written reprimand on May 3, 2004.

On May 4, 2004, Watkins responded with a written rebuttal in which she stated that at the time the client arrived, she assessed the primary waiting area and clinic activity per the protocol and determined that they were too busy to see the client.  Watkins further stated that the client was combative to the point that other clients were concerned about the staff and their safety and that Schloeder should have remained in the clinic to assist with the client.

E.    *May 2004 Incident*

Watkins alleges that on May 5, 2004, while she was in the clerical area of the STD Clinic, Schloeder approached her in an unprofessional manner and rudely told her, "You need to get to the back." Schloeder told her to get back to the patient examination area because there were plenty of patients to be seen.

14

On May 5, 2004, Watkins prepared a memo to Martin complaining that Schloeder was very unprofessional and spoke to Watkins in a harsh, intimidating tone.  Martin and Lewis conducted an investigation into these allegations and concluded that Schloeder behaved inappropriately by correcting Watkins in front of another employee.  They also concluded that there were some inconsistencies in some of the facts that Watkins reported to them during a May 10, 2004 interview.  On July 8, 2004 Schloeder received written counseling on her inappropriate conduct with Watkins and was instructed that generally employees should be corrected in private and praised in public.

F.    *Phone Calls*

Watkins alleges that Schloeder called her on three or four occasions and spoke to her in a harsh tone about clinic flow and patient waiting times.

During the first phone call, Watkins alleges that Schloeder said, "How many patients do you have?" and "You know, I have told you that you need to call me whenever the clinic packs up."

During a second phone call in November or December of 2003, Watkins alleges that Schloeder expressed concerns about clinic flow and patients being seen in a timely manner. Watkins alleges that there was a third phone call involving similar issues.

Finally, Watkins alleges a fourth phone call in January 2004 in which Schloeder called about staffing in the STD Clinic, specifically about the number of nurses present to do STD exams. Watkins alleges that Schloeder said in a harsh tone, "Why don't you inform

15

me about workers who are off?"

G.    *Nurse Manager Classification*

In July 2002, the State Personnel Department changed the state merit classification series pertaining to nurses.  The series changed from Nurse I through Nurse VII to Staff Nurse, Nurse Coordinator, Nurse Supervisor, Nurse Manager, Nurse Administrator, and Nurse Director.  According to Sandra Wood, ADPH Personnel Director, the descriptions of each new classification were different from the descriptions of the old classifications.  When the classification changes were implemented in July 2002, all of the nurses who were previously classified as Nurse V were automatically reclassified as Nurse Supervisor.  However, Area Administrators and Area Nursing Administrators were responsible for then reviewing each nurse's job to determine the correct classification.

In January 2004, Bryan and Martin submitted paperwork to reallocate the Montgomery County Nurse Clinic Supervisor position to the Nurse Manager classification because they believed that Schloeder was working at the higher level.  The Montgomery County Health Department only qualified for one Nurse Manager position.  One of the main distinctions between the Nurse Supervisor and Nurse Manager classifications is that a Nurse Supervisor supervises a staff of five to fifteen employees, while a Nurse Manager supervises a staff of more than fifteen employees.

Once the reclassification was approved, a request for certification of candidates was made to the State Personnel Department.  On September 23, 2004, the State Personnel

Department published a Certification of Candidates with two candidates - Schloeder and

Watkins.  Both were tied for number one on the register.  On September 29, 2004, after

reviewing the certification, Martin notified Schloeder of her appointment to the Nurse

Manager classification and notified Watkins that she was not selected.

In February 2004,[3] Watkins filed an EEOC Charge alleging race discrimination and

hostile work environment.[4]  The EEOC issued a Right to Sue letter on August 31, 2004.

### V. Discussion

Watkins alleges race discrimination, hostile work environment, and retaliation in

violation of Title VII, 42 U.S.C. § 1981, the Fourteenth Amendment's Equal Protection

Clause (through 42 U.S.C. § 1983), and the First Amendment (through 42 U.S.C. § 1983).

*A.      Eleventh Amendment Immunity*

Where, as here, the defendants are state actors, a plaintiff's § 1981 claims merge into

his or her § 1983 claims, and courts treat them as a single claim.  *Taylor v. Alabama*, 95 F.

Supp. 2d 1297, 1309 (M.D. Ala. 2000).  Therefore, Watkins' claims of § 1981 violations,

as well as her First and Fourteenth Amendment claims (made pursuant to § 1983) , will all

be  considered  together  as  §  1983  claims  for  the  purpose  of  Defendants'  Eleventh

---

[3] The EEOC Charge was signed by Watkins on April 1, 2004, but Watkins claims that she submitted the Charge sometime in February 2004, then later received a copy to sign from the EEOC.

[4] Several incidents described above, such as the alleged failure to promote, occurred after the filing of the EEOC Charge.  These incidents form the basis of Watkins' retaliation claims.

17

Amendment immunity defense.[5]

The Defendants are correct in asserting that the Eleventh Amendment bars § 1983 claims for money damages against them in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Therefore, summary judgment is due to be granted as to any claims for money damages brought against the individual Defendants in their official capacities. The Eleventh Amendment also bars § 1983 claims against states or agencies or departments of states for injunctive relief. *See Smith v. State of Ala.*, 996 F. Supp. 1203, 1210 (M.D. Ala. 1998); *see also Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) ("[A] suit in which the State or one if its agencies or departments is named as a defendant is proscribed by the Eleventh Amendment. . . . This jurisdictional bar applies regardless of the nature of the relief sought."). Because the Montgomery County Board of Health and the Alabama Department of Public Health are state agencies, summary judgment is due to be granted as to all claims brought under § 1983 against both of these Defendants.

The Eleventh Amendment does not bar claims for equitable relief against the individual Defendants in their official capacities, as long as those claims are only for

---

[5] Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance,
>
> regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

prospective injunctive relief. *Ex Parte Young*, 209 U.S. 123 (1908). Watkins' requests for an injunction against further discrimination and retaliation may be construed as requests for prospective injunctive relief. Therefore, these claims are not barred by the Eleventh Amendment as to the individual Defendants in their official capacity.

In sum, the Eleventh Amendment bars all § 1983 claims against the Montgomery County Board of Health and the Alabama Department of Public Health and all § 1983 claims against the individual Defendants in their official capacities for money damages. The Eleventh Amendment does not bar Watkins' claims for prospective injunctive relief as to the individual Defendants in their official capacities.

B.      *Exhaustion of Administrative Remedies*

As a precondition to filing suit in federal court, Title VII requires a plaintiff to exhaust all administrative remedies. *See Brown v. General Servs. Admin.*, 425 U.S. 820, 832 (1976). If a plaintiff fails to exhaust administrative remedies, the federal court lacks subject matter jurisdiction over the plaintiff's claim. *Randel v. U.S. Dept. of the Navy*, 157 F.3d 392, 395 (5th Cir. 1998). If a plaintiff does not raise a particular claim in her EEOC charge, the plaintiff has failed to exhaust that claim and cannot then raise it in her complaint. That is, the complaint must be within the scope of the EEOC charge and EEOC investigation. *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985). A claim not raised in the EEOC charge cannot be raised in the complaint unless it is reasonably related to the allegations set forth in the EEOC charge. A claim is deemed to be reasonably related if the claim might

reasonably be expected to be considered in a diligent investigation of those issues expressly raised in the EEOC charge or the claim was in fact considered during the EEOC investigation. *Griffin*, 755 F.2d at 1522. However, "it is unnecessary for a plaintiff to exhaust administrative remedies prior to filing suit for a retaliation claim growing out of an earlier charge; a district court has jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Swanson v. Civil Air Patrol*, 37 F. Supp.2d 1312, 1328 (M.D. Ala. 1998)(citing *Gupta v. East Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. Unit A Aug. 1981).

Defendants assert that Watkins has failed to exhaust her administrative remedies as to her allegations of retaliation and disparate treatment by the issuance of the April 24, 2004 written reprimand and by her failure to be promoted to Nurse Manager. As both alleged incidents occurred after the filing of her EEOC charge, it is clear that they could not have been considered during the EEOC investigation. Therefore, any Title VII claims of disparate treatment concerning these incidents has not been administratively exhausted, and therefore this Court lacks subject matter jurisdiction to consider such claims. However, the Court will consider any Title VII retaliation claims based upon these incidents because administrative exhaustion is not required for the Court to have jurisdiction over retaliation claims growing out of the earlier EEOC charge.

C.    *Hostile Work Environment*

Watkins' First, Second and Third Causes of Action allege a racially hostile work

environment in violation of Title VII, § 1981, and § 1983, respectively.

> In order to establish a Title VII hostile work environment claim, a plaintiff must show:
>
> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based upon a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under a theory of vicarious or direct liability.

*Miller v. Kentworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Defendants do not dispute that Watkins belongs to a protected category or that the conduct at issue was unwelcome. However, Defendants assert that Watkins has not produced sufficient evidence as to the third and fourth factors.

As to the third factor, Watkins has not put forth any evidence that any of the written reprimands or other alleged forms of harassment were based upon her race. None of the comments or actions of any of the Defendants or other ADPH employees appear to be related to race, but instead seem to relate to their perception of Watkins' work performance. The October 2003 written warning resulted from Watkins turning away a client at 3:40 p.m. The January 2004 interaction with Schloeder during which Schloeder was alleged to have threatened to slap Watkins resulted from Watkins instructing a nurse not to give a physical exam after a client refused a blood test. The two discussions about appraisal scores occurred because the supervisors believed Watkins was rating new employees too high. The April 2004 written reprimand was again for turning a client away from the clinic. The May 2004

incident in which Schloeder told Watkins to "get to the back" occurred because Schloeder believed Watkins needed to see patients who were waiting to be examined. All of the phone calls from Schloeder to Watkins concerned clinic flow and patient waiting times. Finally, Watkins not being selected as Nurse Manager had to do with the difference between her type of work and work experiences and those of Schloeder. Though Watkins disputes that she was incorrectly performing her duties on any of these occasions, she nonetheless presents no evidence that any of these actions by Schloeder or others were based upon her race.

As to the fourth factor, there is no evidence that the alleged harassment was sufficiently severe or pervasive to amount to a Title VII violation. The factors to be considered in determining whether a hostile work environment existed are the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). Watkins seems to be arguing that Schloeder's actions constituted the harassment and that Lewis, Martin, Bryan, and Williamson contributed to the hostile work environment by failing to address Schloeder's alleged harassment. Watkins stated that her contact with Schloeder was generally infrequent. In fact, she only alleges four specific instances of harassment involving written or oral reprimands, plus three or four phone calls and two discussions of appraisal scores, over the course of a one-one year period. As to the severity of the conduct, as stated above, there is no evidence that any of the alleged harassment was related to race. Furthermore, none of the

incidents were threatening or humiliating to Watkins, at least in terms of her race. Finally, Watkins has not presented any evidence of a change in her work performance as a result of the alleged harassment. She continues to work in the same position doing the same type of work and none of her employment benefits have changed.

As to the supervisors' failure to address Schloeder's alleged harassment, all evidence points to the contrary. Each time Watkins complained about Schloeder's behavior, a thorough investigation of the allegations was conducted. Schloeder was even counseled on one occasion, was prohibited from walking through the STD Clinic unaccompanied by a supervisor, and was told not to meet with Watkins until her grievances were addressed. Watkins' disagreement with the solutions offered by Martin, Bryan, Lewis, and others is not evidence that they failed to address her complaints.

Therefore, as Watkins has failed to present sufficient evidence as to the third and fourth factors, Watkins' Title VII hostile work environment claim must fail.

In order to prevail on her §1981 and § 1983 hostile working environment claims, Watkins must show the same factors necessary to prevail on her Title VII claim, and must also show that the discriminatory practice was a policy or custom of the entity and that the discrimination was intentional. *See Watkins v. Bowden,* 105 F.3d 1344, 1355 (11th Cir. 1997); *Patterson v. County of Oneida*, 375 F.3d 206, 226-27 (2d Cir. 2004). As Watkins did not present sufficient evidence to support a Title VII hostile working environment claim, she also did not present enough evidence to prevail on her §1981 and § 1983 hostile working

23

environment claims.

Therefore, summary judgment is due to be granted in favor of Defendants on the hostile work environment claims contained in Watkins' First, Second and Third Causes of Action.

D.     *Disparate Treatment Race Discrimination*

Watkins' First, Second and Third Causes of Action allege race discrimination in violation of Title VII, § 1981, and § 1983, respectively.

The analysis applicable to all three types of disparate treatment race discrimination claims is the familiar burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985). First, the plaintiff must establish a *prima facie* case of racial discrimination. This is done by showing (1) that she is a member of a racial minority; (2) that she was subjected to adverse job action; (3) that her employer treated similarly situated employees outside her classification more favorably; and (4) that she was qualified to do the job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Id.* Defendants assert that Watkins has failed to show that she was subjected to an adverse job action or that ADPH treated similarly situated employees differently.

Watkins appears to be claiming that the written reprimands and the other alleged

24

encounters with Schloeder constitute adverse job actions.  To prove an adverse job action, a plaintiff must show "a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, . . . the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).  Mere criticisms of an employee's job performance, either written or oral, even if kept in an employee's personnel file, do not alone constitute adverse job actions.  *See id.* at 1240.  Such criticisms or reprimands must be accompanied by "tangible job consequences."  *Id.*  Watkins presents no evidence that any of the reprimands or other encounters with Schloeder had any effect on her job responsibilities or benefits.  Therefore, Watkins has not shown that these actions were adverse job actions under the *McDonnell Douglas* test.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  *Holifield*, 115 F.3d at 1562.  Watkins alleges that Schloeder never disciplined any of the white nurses.  However, she admitted that she has no evidence that any white nurses were ever accused of doing the same things that Watkins was accused of but were treated differently.  Furthermore, she admitted that she could think of no other employees who did the same things she did but were treated differently.  Thus, Watkins has failed to show the existence of a similarly situated employee.

As Watkins has failed to offer sufficient evidence as to two of the four elements necessary to establish a *prima facie* case of disparate treatment race discrimination, summary judgment is due to be granted in favor of Defendants on Watkins' race discrimination claims as alleged in her First, Second and Third Causes of Action.

Watkins also seems to be making a failure to promote race discrimination claim based on her failure to be chosen for the Nurse Manager position. Though Watkins has failed to exhaust this claim for the purposes of Title VII, the Court will address it under § 1981 and § 1983. To establish a *prima facie* case on a failure to promote claim, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified and applied for the promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the class were promoted. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004). Viewing the facts in the light most favorable to Watkins, she can establish a *prima facie* case of failure to promote because she was arguably qualified for the Nurse Manager position, applied and was rejected for that position, and Schloeder, a white female, was chosen instead.

Thus, the burden shifts to the Defendants to set forth a legitimate, nondiscriminatory reason for its failure to promote Watkins to Nurse Manager. *Wilson*, 376 F.3d at 1089-90. Defendants assert that Schloeder was already doing the work of the Nurse Manager classification and was more qualified for that position than Watkins. In July 2002, when the state merit classification changes went into effect, Schloeder's Nurse V classification was

26

automatically converted to a Nurse Supervisor classification.  However, the definition of Nurse Supervisor included supervision of more than five but less than fifteen employees and Schloeder was supervising well over fifteen employees.  Therefore, in September 2004, Schloeder was reallocated to the Nurse Manager classification, the definition of which includes supervision of fifteen or more employees.  The Montgomery County Health Department was only authorized one Nurse Manager, therefore Schloeder and Watkins could not both be reclassified as Nurse Managers.  As Watkins' duties fit within the definition of Nurse Coordinator, it was decided that she would remain in that position.  Furthermore, Schloeder was more qualified for the Nurse Manager position because she had more supervisory experience than Watkins.  For all of these reasons, Defendants have met their burden of setting forth legitimate, nondiscriminatory reasons for their failure to promote Watkins to Nurse Manager.

Now, the burden shifts back to Watkins to show that the proffered reasons are a pretext for race discrimination.  *See Wilson*, 376 F.3d at 1090.  Watkins alleges that if she had not been given the written reprimand and had points deducted from her annual evaluation, she could have been ranked above Schloeder on the register.  First, there is no evidence that the written reprimands or point deductions were motivated by race.  Second, even if there had been no deductions or reprimands, the evidence shows that Watkins and Schloeder still would have been tied on the register.  Watkins presents no other evidence that Defendants' proffered reasons for not promoting her are a pretext for race discrimination.

27

Therefore, summary judgment is due to be granted in favor of Defendants on Watkins' race discrimination failure to promote claim.

E.     *First Amendment Retaliation*

In her Fourth Cause of Action, Watkins alleges retaliation for exercising her First Amendment rights, in violation of § 1983. Specifically, Watkins claims that the January 16, 2004 memo instructing her not to discuss her grievance with other employees violated her First Amendment rights. As stated above, this claim will only be considered against the individual Defendants in their official capacities and only for prospective injunctive relief.

In order to prevail on a First Amendment claim, a public employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. *Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005).

Whether Watkins has a First Amendment claim turns on whether her statements to other ADPH employees were matters of public concern:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the most appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick v. Myers*, 461 U.S. 138, 147 (1983). A public employee's speech involves matters of public concern if it can "be fairly considered as relating to any matter of political, social,

28

or other concern to the community." *Id.* at 146.  To the extent that Watkins' speech concerned STD Clinic protocol, such as clinic hours or provision of physical exams, that speech cannot be considered a matter of public concern.  In addition, speech which exposes personally suffered discrimination for personal benefit is generally not entitled to First Amendment protection.  *Badia v. City of Miami*, 133 F.3d 1443, 1445 (11th Cir. 1998). Thus, any speech about her personal confrontations with Schloeder or complaints about other supervisors also does not involve matters of public concern.  Therefore, summary judgment is due to be granted in favor of Defendants on Watkins' First Amendment retaliation claim.

## F.   *Retaliation for Filing EEOC charge*

Watkins' Fifth Cause of Action alleges retaliation for having filed an EEOC charge, in violation of Title VII.

Under Title VII, it is unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The burden of proof in a Title VII retaliation case is governed by the framework set forth in *McDonnell Douglas* and its progeny.  First, the plaintiff must establish a *prima facie* case of retaliation.  To do so, the plaintiff must prove (1) that she engaged in statutorily protected expression; (2) that the employer was aware of the activity; (3) that she suffered an adverse employment action; and (4) that there is some causal link between the protected

activity and the adverse employment action. *Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir. 1999)(citing *Little v. United Tech.,* 103 F.3d 956, 959 (11th Cir. 1997)).  If the plaintiff fails to establish a *prima facie* case of retaliation, summary judgment should be granted in favor of the defendant.  *See id.* at 1370.

Watkins alleges that the April 23, 2004 written reprimand and the failure to promote her to Nurse Manager were in retaliation for her filing the EEOC charge in February 2004. Defendants assert that the written reprimand was not an adverse employment action and that the failure to promote was not linked to the EEOC charge.

An adverse employment action is one that a "reasonable employee would have found . . . materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, ___ U.S. ____, 126 S. Ct. 2405, 2415 (2006). The possibility of a written reprimand, which can result in a negative annual evaluation, might have dissuaded a reasonable employee from filing an EEOC charge of discrimination.  As Defendants do not dispute that Watkins has met the other three factors, the Court finds that Watkins has established a *prima facie* case of retaliation based upon the written reprimand.

Now, the burden shifts to the Defendants to produce evidence that they had a nondiscriminatory reason for the written reprimand.  *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).  The employer's burden is "exceedingly light" - it must only raise a genuine issue of fact as to whether it discriminated against the

plaintiff. *Id.* at 1495.  Here, Defendants assert that the written reprimand was given because in turning a client away from the clinic, Watkins failed to perform her job duties.  This reason is sufficient to meet the Defendants' burden.  Thus, the burden shifts back to Watkins to demonstrate that the Defendants' reason is pretextual, *i.e.*, that it is not the true reason for the employment decision.  *Id.*  Watkins alleges that she was following protocol by turning the client away because the clinic was understaffed at the time.  Watkins mere disagreement with the reprimand, however, does not establish that the real reason for the reprimand was retaliation.  Therefore, summary judgment is due to be granted in favor of Defendants on Watkins' retaliation claim as to the written reprimand.

The Court will now address Watkins' retaliation claim as to the failure to promote. The "causal link" element requires "merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).  The only evidence that Watkins has of a causal link between the EEOC Charge filing and the failure to promote is their temporal proximity.  The EEOC Charge was filed in February 2004 and Watkins was notified that she did not receive the promotion to Nurse Manager in September 2004, seven months later.  In order for mere temporal proximity to be sufficient evidence of causality to establish a *prima facie* case, the temporal proximity must be "very close."  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  The Court finds that seven months is not sufficient to establish a causal link, and thus that Watkins has failed to establish a *prima facie* case of

31

retaliation as to the failure to promote.

However, even assuming that Watkins has established a *prima facie* case of retaliation as to the failure to promote, the Defendants have provided a number of legitimate, nondiscriminatory reasons for their failure to promote her, as detailed above in the discussion of disparate treatment race discrimination. As set forth above, Watkins has not presented sufficient evidence that these reasons are pretextual. Therefore, summary judgment is due to be granted in favor of Defendants on Watkins' retaliation claim as to the failure to promote.

### V. Conclusion

For the reasons stated above, the Defendant's Motion for Summary Judgment (Doc. #38) is due to be and is hereby GRANTED.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this 1st day of August, 2006.


_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE